MEYERSON & O'NEILL
By:    Jack Meyerson, Esquire
        Debora A. O'Neill, Esquire
1600 Market Street, Suite 1305
Philadelphia, PA 19103
(215) 972-1376
jmeyerson@meyersonlawfirm.com
doneill@meyersonsonlawfirm.com                    Attorneys for Plaintiff

_____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| IN RE: ZANTAC (RANITIDINE) | : | MDL No. 2924 |
| PRODUCTS LIABILITY | : | |
| LITIGATION | : | 20-MD-2924 |
| | : | JUDGE ROBIN L. ROSENBERG |
| AARON THOMPSON | : | MAGISTRATE JUDGE BRUCE E. REINHART |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | **COMPLAINT & JURY DEMAND** |
| | : | |
| SANOFI US SERVICES INC., SANOFI- | : | |
| AVENTIS U.S. LLC, SANOFI S.A. | : | |
| CHATTEM INC., BOEHRINGER | : | |
| INGELHAM PHARMACEUTICALS, INC. | : | **CIVIL ACTION NO**:_____ |
| PFIZER, INC. and | : | |
| GLAXOSMITHKLINE, LLC. | : | |
| | : | |
| Defendants | : | |

_____

**COMPLAINT**

Plaintiff Aaron Thompson, by and through undersigned counsel, avers as his Complaint

against Defendants as follows:

## NATURE OF ACTION

1.      This is an action for personal injuries and economic damages suffered by Plaintiff Aaron Thompson as a direct result of the Defendants' negligent, fraudulent, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promotion, marketing, distribution, labeling, and/or sale of Zantac, the brand-name version of the generic drug ranitidine.

2.      Zantac and the generic drug ranitidine are popular antacid medications used by millions of people to treat gastrointestinal conditions such as acid indigestion, heartburn, sour stomach and gastroesophageal reflux disease ("GERD").

3.      Zantac and the generic drug ranitidine cause the production of dangerous levels of N-Nitrosodimethylamine ("NDMA") when the drug is digested by the human body.

4.      NDMA is a potent carcinogen which was formerly used in the production of liquid rocket fuel, antioxidants, and additives for lubricants.  The U.S. Food and Drug Administration's ("FDA") allowable daily limit of NDMA is 96 ng (nanograms). However, researchers have detected over 3 million ng. from a single dose of Zantac.

5.      These recent revelations by independent researchers have caused widespread recalls of Zantac both domestically and internationally, and the FDA is actively investigating the issue, with its preliminary results showing "unacceptable" levels of NDMA. On April 1, 2020, the FDA issued an immediate market withdrawal request of all prescription and over-the-counter (OTC) ranitidine drugs. As a result of this market withdrawal request, ranitidine products will not be available for new or existing prescriptions of OTC use in the United States.

6.      Plaintiff Aaron Thompson ingested Zantac for several years and, as a result, developed testicular cancer in August 2018.  His cancer was caused by exposure to NDMA through the ingestion of Zantac.

## PARTIES

7.     Plaintiff AARON THOMPSON  is an adult individual, who is a resident of Yelm, Washington.

8.     Defendant SANOFI US SERVICES INC., is a Delaware corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is a wholly owned subsidiary of Sanofi S.A., a French multinational corporation.  Sanofi controlled the NDA for OTC Zantac starting in January 2017 through the present and manufactured and distributed the drug in the United States during that period. Sanofi voluntarily recalled all brand name OTC Zantac on October 18, 2019.

9.     Defendant SONOFI-AVENTIS U.S. LLC is a Delaware limited liability corporation with a principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807, and is a wholly owned subsidiary of Sanofi S.A., a French multinational corporation.

10.     Defendant SANOFI S.A. also known as Sanofi Consumer Healthcare, is a French multinational pharmaceutical company headquartered in Paris, France, with its principal place of business located at 54, Rue La Boétie in the 8th arrondissement. Sanofi S.A. was formed as Sanofi-Aventis in 2004 by the merger of Aventis and Sanofi-Synthélabo. The defendant company Sanofi S.A. changed its name to Sanofi in May 2011.

11.     Defendant CHATTEM, INC. ("Chattem") is a Tennessee corporation with its principal place of business located at 1715 West 38th Street Chattanooga, Tennessee 37409, and is a wholly owned subsidiary of Sanofi S.A., a French multinational corporation. Chattem distributed OTC Zantac for Sanofi throughout the United States until Sanofi's recent voluntary recall.

3

12.     Defendants SANOFI US SERVICES INC., SONOFI-AVENTIS U.S. LLC, SANOFI S.A and CHATTEM, INC. (collectively "Sanofi" or "Sanofi Defendants") controlled the U.S. rights to Zantac from about January 2017 to the present, and manufactured and distributed the drug in the United States during that period.

13.     Defendant BOEHRINGER INGELHEIM PHARMACEUTICALS, INC. ("Boehringer") is a Delaware corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877, and is a subsidiary of the German company Boehringer Ingelheim Corporation.  Boehringer owned and controlled the NDA for over-the-counter ("OTC") Zantac between December 2006 and January 2017, and manufactured and distributed the drug in the United States during that period.

14.     Defendant PFIZER, INC. ("Pfizer") is a Delaware corporation with its principal place of business located at 235 East 42nd Street, New York, New York 10017.  In 1993, Glaxo Wellcome, plc formed a joint venture with Warner-Lambert, Inc. to develop and obtain OTC approval for Zantac. That OTC approval was obtained in 1995.  In 1997, Warner-Lambert and Glaxo Wellcome ended their joint venture, with Warner-Lambert retaining control over the OTC NDA for Zantac and the Zantac trademark in the U.S. and Glaxo Welcome retaining control over the Zantac trademark internationally.  In 2000, Warner-Lambert was acquired by Pfizer, who maintained control over the Zantac OTC NDA until December 2006.

15.     Defendant GLAXOSMITHKLINE, LLC ("GSK") is a Delaware company with its principal place of business located at 5 Crescent Drive, Philadelphia, Pennsylvania, 19112 and Five Moore Drive, Research Triangle, North Carolina, 27709.  GSK is a wholly owned subsidiary of GlaxoSmithKline, plc, which is its sole member.  GlaxoSmithKline, plc is a citizen of the United Kingdom, and is not a citizen of any state in the United States.

GlaxoSmithKline plc is the successor-in-interest to the companies that initially developed, patented, and commercialized the molecule known as ranitidine. Ranitidine was initially developed by Allen & Hanburys Ltd., which was a subsidiary of Glaxo Labs Ltd. Allen & Hanburys Ltd. was awarded Patent No. 4,128,658 by the U.S. Patent and Trademark Office in December 1978, which covered the ranitidine molecule. In 1983, Glaxo Holdings, Ltd. was awarded approval by the U.S.FDA to sell Zantac in the United States. Glaxo Holdings, Ltd. was later absorbed into Glaxo Wellcome, plc. And then, in 2000, GlaxoSmithKline, plc and GSK were created by the merger of Glaxo Wellcome and SmithKline Beecham. GSK, and its predecessors, controlled the prescription Zantac NDA between 1983 and 2009.

## JURISDICTION AND VENUE

16.     Pursuant to Pretrial Order No. 11, in *In re Zantac (Ranitidine) Products Liability Litigation,* MDL No. 2924, this Complaint is directly filed in the Southern District of Florida as a personal injury claim brought by Plaintiff based on usage or purchase of Zantac or ranitidine in the United States. Without the direct filing procedure, this action would have been filed in the United States District Court for the Western District of Washington, Plaintiff's federal district of residence.

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties. And the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     This Court has personal jurisdiction over each Defendant insofar as each Defendant is authorized and licensed to conduct business in Plaintiffs' federal district of residence, maintains and carries on systematic and continuous contacts in this judicial district, regularly

transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

19.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## FACTUAL ALLEGATIONS

### A. Brief History of Zantac

20.     Zantac was developed by Glaxo, now GlaxoSmithKline, and the FDA approved prescription use of the drug in 1983. The drug belongs to a class of medications called histamine H2-receptor antagonists (or H2 blockers), which decrease the amount of acid produced by the stomach and are used to treat gastric ulcers, heartburn, acid indigestion, sour stomach, and other gastrointestinal conditions.  Ranitidine was specifically developed by Glaxo to compete with the then leading H2 blocker, cimetidine (Tagamet)..

21.     At the time that ranitidine was developed, there was scientific literature suggesting that drugs like ranitidine, which contain a dimethylamine ("DMA") group within the molecule, are highly likely to form NDMA, when combined with other substances, i.e., nitrite, already found in the body.  Indeed, nitrite is not only naturally found in the body, but bacteria and enzymes in the body, reduce the nitrates (NO3) found in food into nitrites (NO2-) and many foods and preservatives contain nitrates.  Glaxo scientists should have known that human physiology and diet would lead to the development of NDMA in the human body after ingestion of ranitidine.

22.     As a result of GSK's marketing strategy, Zantac became a very successful drug, reaching $1 billion in total sales in December 1986. As one 1996 article put it, Zantac became "the best-selling drug in history as a result of a shrewd, multifaceted marketing strategy that . .

.enabled the product to dominate the acid/peptic marketplace."[1]  Significantly, the marketing strategy that led to Zantac's success emphasized the purported safety of the drug.

23.     Zantac became available without a prescription in 1996, and generic versions of the drug (ranitidine) became available the following year.  Although sales of brand-name Zantac declined as a result of generic and alternative products, Zantac sales have remained strong over time. As recently as 2018, Zantac was one of the top 10 antacid tablet brands in the United States, with sales of Zantac 150 totaling $128.9 million—a 3.1% increase from the previous year.

24.     Common brands of ranitidine include: Zantac, Wal-Zan 75, Heartburn Relief, Acid Reducer, Acid Control, Wal-Zan 150, Maximum Strength Zantac 150, and Zantac 75.

25.     Zantac was available for purchase over-the-counter in 75 and 150 mg pills, and by prescription in 300 mg pills.

26.     Over the past 20 years, the rights to Zantac in the U.S. have changed manufacturers several times. GSK, and its predecessors, controlled the prescription Zantac NDA between 1983 and 2009 and Pfizer maintained control over the Zantac OTC NDA until December 2006.

27.     Defendant Boehringer acquired the rights to OTC Zantac in late 2006 and manufactured and sold the drug in the U.S. from approximately January 2007 to January 2017.

28.     The Sanofi Defendants acquired the rights to OTC Zantac in approximately January 2017 and since that date have manufactured and sold the drug in the U.S.

**B.  The Dangers of NDMA**

29.     NDMA is a semi-volatile organic chemical that forms in both industrial and natural processes.  It is a member of N-nitrosamines, a family of potent carcinogens.

---

[1] Wright, R., *How Zantac Became the Best-Selling Drug in History*, 1 J. HEALTHCARE MARKETING 4, 24 (Winter 1996).

30.     The dangers that NDMA poses to human health have long been recognized.  A news article published in 1979 noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[2] NDMA is no longer produced or commercially used in the United States, except for research, such as a tumor initiator in certain animal bioassays.   In other words, it is only a poison.

31.     Both the Environmental Protection Agency ("EPA") and the International Agency for Research on Cancer ("IARC") have classified NDMA as a probable human carcinogen.  And the World Health Organization ("WHO") has stated that scientific testing indicates that NDMA consumption is positively associated with either gastric or colorectal cancer and suggests that humans may be especially sensitive to the carcinogenicity of NDMA.

32.      As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.

33.     Most recently, beginning in the summer of 2018, there have been recalls of several generic drugs used to treat high blood pressure and heart failure—valsartan, losartan, and irbesartan—because the medications contained nitrosamine impurities that do not meet the FDA's safety standards.  The FDA has established a permissible daily intake limit for the probable human carcinogen, NDMA, of 96 ng (nanogram).  However, the highest level of NDMA detected by the FDA in any of the Valsartan tablets was 20.19 μg (or 20,190 ng) per tablet.   In the case of

---

[2] Jane Brody, *Bottoms Up: Alcohol in moderation can extend life*, THE GLOBE AND MAIL (CANADA) (Oct. 11, 1979); *see* Rudy Platiel, *Anger grows as officials unable to trace poison in reserve's water*, THE GLOBE AND MAIL CANADA) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); Kyrtopoulos et al, *DNA adducts in humans after exposure to methylating agents*, 405

Valsartan, the NDMA was an impurity caused by a manufacturing defect, and thus NDMA was present in only *some* products containing valsartan.

34.    Zantac poses a greater safety risk than any of the recently recalled valsartan tablets. Not only is NDMA a byproduct of the ranitidine molecule, itself, but the levels observed in recent testing show NDMA levels in excess of 3,000,000 ng.

35.    In mouse studies examining the carcinogenicity of NDMA through oral administration, animals exposed to NDMA developed cancer in the kidney, bladder, liver, and lung. In comparable rat studies, similar cancers were observed in the liver, kidney, pancreas, and lung.  In comparable hamster studies, similar cancers were observed in the liver, pancreas, and stomach.  In comparable Guinea-pig studies, similar cancers were observed in the liver and lung. In comparable rabbit studies, similar cancers were observed in the liver and lung.

36.    In other long-term animal studies in mice and rats utilizing different routes of exposures—inhalation, subcutaneous injection, and intraperitoneal (abdomen injection)—cancer was observed in the lung, liver, kidney, nasal cavity, and stomach.

37.    NDMA breaks down into various derivative molecules that, themselves, are associated with causing cancer.  In animal studies, derivatives of NDMA induced cancer in the stomach and intestine (including colon).

38.    Numerous *in vitro* studies confirm that NDMA is a mutagen—causing mutations in human and animal cells.

39.    In addition to the overwhelming animal data linking NDMA to cancer, there are numerous epidemiological studies investigating the effects of dietary exposure to various cancers. These studies which show an increased risk of various cancers involve exposure levels

of a very small fraction – as little as 1 millionth – the exposure noted in a single Zantac capsule, i.e., 0.19 ng/day (dietary) v. 304,500 ng/day (Zantac).[3]

40.  In a 1999 epidemiological cohort study looking at NDMA dietary exposure with 189 cases and a follow up of 24 years, researchers noted that "*N*-nitroso compounds are potent carcinogens" and that dietary exposure to NDMA more than doubled the risk of developing colorectal cancer.[4]

41.  In a 2000 epidemiological cohort study looking at occupational exposure of workers in the rubber industry, researchers observed significant increased risks for NDMA exposure for esophagus, oral cavity, pharynx, prostate, and brain cancer.[5]

42.  In a 2011 epidemiological cohort study looking at NDMA dietary exposure with 3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was significantly associated with increased cancer risk in men and women" for all cancers, and that "NDMA was associated with increased risk of gastrointestinal cancers" including rectal cancers.[6]

---

[3] Pobel et al, *Nitrosamine, nitrate and nitrite in relation to gastric cancer: a case-control study in Marseille, France*, 11 EUROP. J. EPIDEMIOL. 67–73 (1995)(exposure more than 0.51 ng/day); La Vecchia et al, *Nitrosamine intake and gastric cancer risk*, 4 EUROP. J. CANCER. PREV. 469–474 (1995)(exposure of .191 ng/day); Rogers et al, *Consumption of nitrate, nitrite, and nitrosodimethylamine and the risk of upper aerodigestive tract cance*r, 5 CANCER EPIDEMIOL. BIOMARKERS PREV. 29–36 (1995)(exposure of 179 ng/day).
[4] Knekt et al, *Risk of Colorectal and Other Gastro-Intestinal Cancers after Exposure to Nitrate,Nitrite and N-nitroso Compounds: A Follow-Up Study*, 80 INT. J. CANCER 852–856 (1999)
[5] Straif et al, *Exposure to high concentrations of nitrosamines and cancer mortality among a cohort of rubber workers*, 57 OCCUP ENVIRON MED 180–187 (2000).
[6] Loh et al, *N-nitroso compounds and cancer incidence: the European Prospective Investigation into Cancer and Nutrition (EPIC)–Norfolk Study*, 93 AM J CLIN NUTR. 1053–61 (2011).

43.     In a 2014 epidemiological case-control study looking at NDMA dietary exposure with 2,481 cases, researchers found a statistically significant elevated association between NDMA exposure and colorectal cancer.[7]

### C. Ranitidine Forms NDMA in the Body

44.     Valisure, LLC is an online pharmacy currently licensed in 38 states and an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization ("ISO"). Valisure also is registered with the Drug Enforcement Administration and the FDA. Valisure's mission is to help ensure the safety, quality, and consistency of medications and supplements in the market.  In response to rising concerns about counterfeit medications, generics, and overseas manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard assays to test every batch of every medication it dispenses.

45.     Recent scientific testing conducted by Valisure LLC and Valisure RX LLC (collectively "Valisure") "has detected extremely high levels of NDMA in all lots [of ranitidine] tested across multiple manufacturers of ranitidine products", including Zantac.[8]

46.     Valisure has notified the FDA of its findings by filing a citizen's petition on September 9, 2019.[9]

47.     Valisure's testing found, on average, 2,692,291 ng of NDMA in a 150 mg Zantac tablet.  In comparison to the  FDA's permissible limit of 96 ng, the level of NDMA in one 150 mg dose of Zantac is **28,000 times** the legal limit.[10]

---

[7] Zhu et al, *Dietary N-nitroso compounds and risk of colorectal cancer: a case-control study in Newfoundland and Labrador and Ontario, Canada*, 111 BR J NUTR. 6, 1109–1117 (2014).
[8] Valisure Citizen Petition to FDA ("Citizen Petition") at pg. 6.
[9] Id.
[10] Citizen Petition at pg. 6, Table 1.

48.     Valisure tested ranitidine tablets by themselves and in conditions simulating the human stomach.  Industry standard "Simulated Gastric Fluid" ("SGF" 50 mM potassium chloride, 85 mM hydrochloric acid adjusted to pH 1.2 with 1.25 g pepsin per liter) and "Simulated Intestinal Fluid" ("SIF" 50 mM potassium chloride, 50 mM potassium phosphate monobasic adjusted to pH 6.8 with hydrochloric acid and sodium hydroxide) were used alone and in combination with various concentrations of nitrite, which is commonly ingested in foods like processed meats and is elevated in the stomach by antacid drugs.

49.     The results of Valisure's tests on ranitidine tablets in biologically relevant conditions demonstrate significant NDMA formation under simulated gastric conditions with nitrite present.[11]

50.     Under biologically relevant conditions, when nitrites are present, staggeringly high levels of NDMA are found in one dose of 150 mg Zantac, ranging between 245 and 3,100 times above the FDA-allowable limit.

51.     Antacid drugs are known to increase stomach pH and thereby increase the growth of nitrite-reducing bacteria which further elevate levels of nitrite. This fact is well known and even present in the warning labels of antacids like Prevacid (lansoprazole) and was specifically studied with ranitidine in the original approval of the drug.[12]

52.     As stated in Valisure's petition, NDMA formation in the stomach has been a concern for many years and specifically ranitidine has been implicated as a cause of NDMA formation by multiple research groups, including those at Stanford University.[13]

53.     A study completed and published in 2016 by Stanford University showed "that healthy individuals, both male and female, who ingested Zantac 150 mg tablets produced roughly

---

[11] Citizen Petition at pg. 7, Table 2.
[12] Citizen Petition at pg. 7.
[13] Id. at pg.8.

400 times elevated amounts of NDMA in their urine (over 40,000 nanograms) in the proceeding 24 hours after ingestion. These results alone are extremely alarming, given NDMA has been implicated as an etiological agent for bladder cancer, however, the implications could be significantly worse given that NDMA is known to be heavily absorbed by the body instead of being excreted into urine."[14]

54.     Likely due to the perceived high safety profile of ranitidine, very few epidemiological studies have been conducted on this drug.

55.     A 2004 study published by the National Cancer Institute investigated 414 cases of peptic ulcer disease reported in 1986 and followed the individual cases for 14 years.[22]  One of the variables investigated by the authors was the patients' consumption of a prescription antacid, either Tagamet (cimetidine) or Zantac (ranitidine).  The authors concluded that "[r]ecent use of ulcer treatment medication (Tagamet and Zantac) was also related to the risk of bladder cancer, and this association was independent of the elevated risk observed with gastric ulcers." Specifically, the authors note that "N-Nitrosamines are known carcinogens, and nitrate ingestion has been related to bladder cancer risk."  NDMA is among the most common of the N-Nitrosamines.

56.     A 1982 clinical study in rats compared ranitidine and cimetidine exposure in combination with nitrite.  When investigating DNA fragmentation in the rats' livers, no effect was observed for cimetidine administered with nitrite, but ranitidine administered with nitrite resulted in a significant DNA fragmentation.[15]

---

[14] Id. at pg.11, citing Zeng et al, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37 CARCINOGENESIS 625-634 (2016).
[15] Brambilla et al, *Genotoxic Effects of Drugs: Experimental Findings Concerning Some Chemical Families of Therapeutic Relevance*, 52 CHEMICAL CARCINOGENESIS (1982).

57.     Investigators at Memorial Sloan Kettering Cancer Center are actively studying ranitidine to evaluate the extent of the public health implications of these findings.  Regarding ranitidine, one of the investigators commented: "A potential link between NDMA and ranitidine is concerning, particularly considering the widespread use of this medication. Given the known carcinogenic potential of NDMA, this finding may have significant public health implications[.]"[16]

58.     On September 13, 2019, the Food and Drug Administration ("FDA") issued a public statement that some ranitidine medicines, including Zantac, contain an impurity called N-nitrosodimethylamine (NDMA).

59.     Since the filing of Valisure's Citizen Petition on September 9, 2019, regulatory agencies around the world have acted to recall the drug. In addition, many manufacturers, including the Boehringer and Sanofi Defendants, have also recalled the drug.

60.     Additionally, on April 1, 2020, the FDA issued an immediate market withdrawal request of all prescription and over- the-counter (OTC) ranitidine drugs.

**D.  Defendants Failed to Disclose the Risk of Exposure to NDMA**

61.     During the time that Defendants manufactured and sold Zantac in the United States, the weight of scientific evidence showed that Zantac exposed users to unsafe levels of NDMA. Defendants failed to disclose this risk to consumers on the drug's label—or through any other means—and Defendants failed to report these risks to the FDA.

62.     In 1981, the same year Zantac was launched commercially outside of the US, two exchanges in The Lancet—one of the most widely read and respected medical and

---

[16] Citizen Petition at pg. 12, note 24.

scientific publications—discussed the potential toxicity of cimetidine and ranitidine. Cimetidine, also an H2 blocker, has a similar chemical structure to ranitidine.

63.     In one exchange, Dr. Silvio de Flora, an Italian researcher from the University of Genoa, wrote into The Lancet describing how the researchers detected "mutagenic nitroso derivatives" in vitro for both cimetidine as well as ranitidine.[17]   Concerned with these results, Dr. de Flora cautioned that, in the context of ranitidine ingestion, "it would seem prudent to avoid nitrosation as far as possible by, for example, suggesting a diet low in nitrates and nitrites, by asking patients not to take these at times close to (or with) meals, or by giving inhibitors of nitrosation such as ascorbid acid."

64.     GSK responded to Dr. de Flora's concern.[18]   A group of GSK researchers specifically noted they "were obviously concerned as to whether or not a mutagenic N-nitroso derivative of ranitidine could be formed in the stomach."  Apparently, GSK was fully aware of the potential NDMA issue.  GSK acknowledged that ranitidine that in the presence of nitrites, a "N-nitroso nitrolic acid derivative was formed" that was "mutagenic[.]"  GSK, however, dismissed this finding because the levels of nitrate used were much higher than what would be expected to occur after a meal and, therefore, any N-Nitroso compound found would not likely occur in human in real world experiences. GSK asserted that "no mutagenic nitrosated product of ranitidine is likely to be formed in man under any conceivable physiological conditions[.]"

65.     In 1983, the same year Zantac was approved in the U.S., seven researchers from the University of Genoa published a study discussing the nitrosation of ranitidine and its

---

[17] De Flora, *Cimetidine, Ranitidine and Their Mutagenic Nitroso Derivatives*, THE LANCET  993-994 (Oct.31, 1981).
[18] Brittain et al, *The Safety of Ranitidine*, THE LANCET  1119 (Nov. 14, 1981).

genotoxic effects (ability to harm DNA).[19]  The researchers concluded "it appears that reaction of ranitidine with excess sodium nitrite under acid conditions gives rise to a nitroso-derivative (or derivatives) [like NDMA] capable of inducing DNA damage in mammalian cells. … These findings are consistent with those of De Flora, who showed that preincubation of ranitidine with excess nitrite in human gastric juice resulted in mutagenic effects[.]"

66.     By 1987, after numerous studies raised concerns over ranitidine and cancerous nitroso compounds , GSK published a clinical study specifically investigating gastric contents in human patients and N-nitroso compounds.[20]  The study concluded that there were no elevated levels of N-nitroso compounds (of which NDMA is one) "which likely built confidence in the medical community that ranitidine was not associated with N-nitrosamines like NDMA." [21].

67.     However, the study "had a few significant weaknesses that prevented the detection of NDMA formation from ranitidine." Specifically, the study used an analytical system called a "nitrogen oxide assay" as opposed to the industry standard chromatography.

68.     Additionally, this method necessitated "discarding all gastric samples that contained ranitidine."[22] As a result, without ranitidine being present in any sample, any degradation into NDMA could not, by design, be observed.  Upon information and belief, this manner of test was intentional and designed to mask any potential cancer risk.

69.     Despite the undeniable scientific evidence linking ranitidine to the production of high levels of NDMA, Defendants did not disclose this link to consumers on Zantac's label or through other means.

---

[19] Maura et al, *DNA Damage Induced by Nitrosated Ranitidine in Cultured Mammalian Cells*, 18 TOX. LTTRS. 97-102 (1983).
[20] Thomas et al, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents*, 6 *GUT*. Vol. 28, 726-738 (1987).
[21] Citizen Petition at pg. 13
[22] Id.

70.     As noted in the Valisure study, there are multiple alternative antacid drugs where NDMA was not detected.

71.     Defendants concealed the Zantac–NDMA link from consumers in part by not reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit citizen petitions) to bring new information about an approved drug like Zantac to the agency's attention.

72.     Manufacturers of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to 21 C.F.R. § 314.81(b)(2):

73.     The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

74.     The manufacturer's annual report also must contain copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product." 21 C.F.R. § 314.81(b)(2)(v).

75.     Defendants ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety or labeling of Zantac.

76.     Defendants never provided the relevant studies to the FDA, nor did they present to the FDA with a proposed disclosure noting the link between ranitidine and NDMA.

77.     Defendants have had notice of serious adverse health outcomes regarding cancer and other injuries associated with their ranitidine products, including Zantac, through case reports, clinical studies and post-market surveillance.

78.     As such, these numerous reports of cancer put Defendants on notice as to the excessive risks of injuries related to the use of ranitidine products, including Zantac, and yet those products remain easily accessible to consumers such as Plaintiff.

79.     Defendants knew or should have known that Zantac exposed users to unsafe levels of the carcinogen NDMA based on the data available to them or that could have been generated by them, including but not limited to animal studies, mechanisms of action, pharmacodynamics, pharmacokinetics, pre-clinical studies, clinical studies, animal models, genetic models, analogous compounds, analogous conditions, adverse event reports, case reports, post-marketing reports and regulatory authority investigations.

80.     Despite their knowledge that exposure to unsafe levels of NDMA could result in cancer, Defendants took no action to inform Plaintiff, Plaintiff's physicians and/or the FDA of this known risk. Instead, Defendants continued to represent that their ranitidine products, including Zantac, had been tested and were found to be safe and effective for their indicated use in treating gastric ulcers, heartburn, acid indigestion, sour stomach, and other gastrointestinal conditions. Defendants promoted and marketed ranitidine products, including Zantac, as safe and effective for individuals such as Plaintiff throughout the United States, including Washington.

81.     Defendants negligently and/or recklessly failed to disclose their knowledge that their ranitidine products, including Zantac, contained unsafe levels of NDMA that could cause cancer, from Plaintiff, Plaintiff's treating physicians, hospitals, pharmacies, the FDA, the public in general and/or the medical community.

82.     Even if used as directed, Defendants failed to adequately warn against the negative effects and risks associated with ranitidine products, including Zantac, including, but not necessarily limited to, long-term usage and the cumulative effects of long-term usage.

83.     In omitting and inadequately providing critical safety information regarding the use of ranitidine products, including Zantac, in order to induce their purchase and use, Defendants engaged in and continue to engage in conduct likely to mislead consumers including Plaintiff.

84.     Despite notice and knowledge that ranitidine products, including Zantac, contained unsafe levels of NDMA which can cause cancer and other severe health problems, Defendants continued to market and sell ranitidine products, including Zantac, without warning consumers, healthcare providers, and/or the FDA of these significant risks.

85.     Consumers, including Plaintiff, relied on the Defendants' false representations and were misled as to Zantac's safety.

86.     Had Plaintiff known of the risks of cancer and other injuries associated with Zantac, she would not have used the drug.

87.     As a result of Defendants' action and inactions as outlined herein, Plaintiff was injured due to his ingestion of Zantac, which caused Plaintiff to suffer from cancer and any and all sequelae.

88.     Defendants misrepresented and failed to disclose risks of cancer and other injuries associated with Zantac with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and/or purchase Zantac or ranitidine for the treatment of gastric ulcers, heartburn, acid indigestion, sour stomach, and other gastrointestinal

conditions, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare.

89.     As a result of the foregoing acts and omissions, Plaintiff was and still is caused to suffer serious and dangerous side effects, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any additional health consequences.

90.     Consequently, Plaintiff seeks compensatory damages as a result of Plaintiff's use of Zantac, which has caused Plaintiff to suffer from testicular cancer as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences.

91.     Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice.  Defendants were fully aware of the safety risks of Zantac, particularly the carcinogenic potential of Zantac as it transforms into NDMA within the chemical environment of the human body.  Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead consumers.

92.     This was not done by accident or through some justifiable negligence.  Rather, Defendants knew that it could turn a profit by convincing consumers that Zantac was harmless to humans, and that full disclosure of the true risks of Zantac would limit the amount of money Defendants would make selling Zantac. Defendants' object was accomplished not only through its misleading label, but through a comprehensive scheme of selective misleading research and

testing, false advertising, and deceptive omissions as more fully alleged throughout this pleading.  Plaintiff was denied the right to make an informed decision about whether to purchase and use Zantac, knowing the full risks attendant to that use.  Such conduct was done with conscious disregard of Plaintiff's rights.

93.     Accordingly, Plaintiff requests punitive damages against Defendants for the harms caused to Plaintiffs.

**E. Plaintiff Specific Allegations**

94.     Plaintiff began using Zantac in 2014 and continued to use it through 2018.

95.     In August 2018, Plaintiff was diagnosed with testicular cancer.

96.     Based on prevailing scientific evidence, exposure to Zantac (and the attendant NDMA) can cause cancer in humans.

97.     Plaintiff's cancer was caused by ingestion of Zantac.

98.     Had any Defendant warned Plaintiff that Zantac could lead to exposure to NDMA or, in turn, cancer, Plaintiff would not have taken Zantac.

99.     Plaintiff did not learn of the link between his cancer and Zantac exposure until dissemination of recent articles concerning the high levels of NDMA in Zantac.

100.     After being diagnosed with cancer, Plaintiff investigated what could have caused his cancer, but to no avail until recently when he/she heard about the connection of Zantac to NDMA and cancer.

**F. Tolling of the Statute of Limitations and Estoppel**

**(1)  Discovery Rule Tolling**

101.     Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that high levels of the carcinogen NDMA was produced by Zantac ingestion.

102.     Plaintiff did not know of or discover facts that would have caused a reasonable person to suspect that his injuries were caused by Zantac, or by Defendants' concealment of the fact that high levels of NDMA were produced by Zantac.

103.     Plaintiff could not have reasonably discovered the true extent of Defendants' deception about Zantac's safety until Valisure filed its Citizen Petition disclosing the extremely high levels of NDMA produced by Zantac.

104.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule.

**(2) Fraudulent Concealment Tolling**

105.     All applicable statutes of limitation have also been tolled by Defendants' fraudulent concealment throughout the period relevant to this action of Zantac's producing high levels of the carcinogen NDMA.

106.     Instead of disclosing to consumers the link between Zantac and the carcinogen NDMA, Defendants continued to manufacture and sell Zantac without disclosing this information on the drug's label or elsewhere. Further, Defendants misled the public into believing Zantac was safe by repeatedly touting the safety of Zantac.

### (3)  Estoppel

107.    Defendants were under a continuous duty to disclose to Plaintiff the risk of NDMA exposure associated with Zantac.

108.    Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the true risks of NDMA exposure associated with Zantac and never updated the drug's label to disclose this risk.

109.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

### FIRST CAUSE OF ACTION
### AS AGAINST ALL DEFENDANTS
### (NEGLIGENCE)

110.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully stated herein.

111.    Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Ranitidine products, including Zantac, into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

112.    Defendants failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Ranitidine products, including Zantac, into interstate commerce in that Defendants knew or should have known that using Ranitidine products, including Zantac, could proximately cause Plaintiff's injuries. Specifically, Defendants failed to meet their duty to use reasonable care in the testing, creating, designing, manufacturing, labeling, packaging, marketing, selling, and warning of Ranitidine products, including Zantac. Defendants

23

are liable for acts and/or omissions amounting to negligence, gross negligence and/or malice

including, but not limited to the following:

(a) Failure to adequately warn Plaintiff and Plaintiff's physicians of the known or reasonably foreseeable danger that plaintiff would suffer a serious injury or death by ingesting Ranitidine products, including Zantac;

(b) Failure to adequately warn Plaintiff and Plaintiff's physicians of the known or reasonably foreseeable danger that Plaintiff would suffer a serious injury or death by ingesting Ranitidine products, including Zantac, in unsafe doses;

(c) Failure to use reasonable care in testing and inspecting Ranitidine products, including Zantac, so as to ascertain whether or not they were safe for the purpose for which they were designed, manufactured and sold;

(d) Failure to use reasonable care in implementing and/or utilizing a reasonably safe design in the manufacture of Zantac;

(e) Failure to use reasonable care in the process of manufacturing Ranitidine products, including Zantac, in a reasonably safe condition for the use for which it was intended;

(f) Failure to use reasonable care in the manner and method of warning Plaintiff and Plaintiff's physicians as to the danger and risks of using Ranitidine products, including Zantac, in unsafe doses; and

(g) Such further acts and/or omissions that may be proven at trial.

113.     The above-described acts and/or omissions of Defendants were a direct and

proximate cause of the severe, permanent and disabling injuries and resulting damages to

Plaintiff.

114.     The negligence of the Defendants, their agents, servants, and/or employees,

included but was not limited to the following acts and/or omissions:

(a) Manufacturing, producing, promoting, formulating, creating, and/or designing Ranitidine products, including Zantac, without thoroughly testing it;

(b) Manufacturing, producing, promoting, formulating, creating, and/or designing Ranitidine products, including Zantac, without adequately testing it;

(c) Not conducting sufficient testing programs to determine whether or not Ranitidine products, including Zantac, were safe for use; in that Defendants herein knew or should have known that Ranitidine products, including Zantac, were unsafe and unfit for use by reason of the dangers to its users;

(d) Selling Ranitidine products, including Zantac, without making proper and sufficient tests to determine the dangers to their users;

(e) Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and healthcare profession, and the FDA of the dangers of Ranitidine products, including Zantac;

(f) Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Zantac;

(g) Failing to test Ranitidine products, including Zantac, and/or failing to adequately, sufficiently, and properly test Ranitidine products, including Zantac;

(h) Negligently advertising and recommending the use of Ranitidine products, including Zantac, without sufficient knowledge as to their dangerous propensities;

(i) Negligently representing that Ranitidine products, including Zantac, were safe for use for its intended purpose, when, in fact, they were unsafe;

(j) Negligently designing Ranitidine products, including Zantac, in a manner which was dangerous to their users;

(k) Negligently manufacturing Ranitidine products, including Zantac, in a manner which was dangerous to their users;

(l) Negligently producing Ranitidine products, including Zantac, in a manner which was dangerous to their users;

(m) Negligently assembling Ranitidine products, including Zantac, in a manner which was dangerous to their users;

(n) Concealing information from the Plaintiff in knowing that Ranitidine products, including Zantac, were unsafe, dangerous, and/or nonconforming with FDA regulations.

115.     Defendants under-reported, underestimated and downplayed the serious dangers of Ranitidine products, including Zantac.

116.     Defendants negligently compared the safety risk and/or dangers of Ranitidine products, including Zantac, with other forms of treatment for peptic disorders, including erosive esophagitis, gastroesophageal reflux disease-"GERD", and Zollinger-Ellison syndrome.

117.     Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Ranitidine products, including Zantac, in that they:

(a)  Failed to use due care in designing and manufacturing Ranitidine products, including Zantac, so as to avoid the aforementioned risks to individuals when Ranitidine products, including Zantac, were used for treatment of peptic disorders which include erosive esophagitis, gastroesophageal reflux disease-"GERD", and Zollinger-Ellison syndrome;

(b)  Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the uses of Ranitidine products, including Zantac;

(c)  Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Ranitidine products, including Zantac;

(d)  Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Ranitidine products, including Zantac;

(e)  Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

(f)  Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Ranitidine products, including Zantac;

(g)  Failed to warn Plaintiff, prior to actively encouraging the sale of Ranitidine products, including Zantac; either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects;

(h)    Were otherwise careless and/or negligent.

118.    Despite the fact that Defendants knew or should have known that Ranitidine products, including Zantac, caused unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute and/or sell Ranitidine products, including Zantac, to consumers, including the Plaintiff.

119.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

120.    Defendants' negligence was the proximate cause of Plaintiff's injuries, harm, and economic loss which Plaintiff suffered.

121.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including cancer as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

122.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

123.    By reason of the foregoing, Plaintiff has been damaged as against the Defendants in an amount in excess of $75,000 to be proven at trial.

## SECOND CAUSE OF ACTION
## AS AGAINST ALL DEFENDANTS
## (STRICT PRODUCTS LIABILITY)

124.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully stated herein.

125.     At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Ranitidine products, including Zantac, as hereinabove described that was used by the Plaintiff.

126.     That Ranitidine products, including Zantac, were expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

127.     At those times, Ranitidine products, including Zantac, were in unsafe, defective, and inherently dangerous conditions, which was dangerous to users, and in particular, the Plaintiff herein.

128.     The Ranitidine products, including Zantac, designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective in design or formulation in that, when they left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of the Ranitidine products, including Zantac.

129.     The Ranitidine products, including Zantac, designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were

defective in design and/or formulation, in that, when they left the hands of the Defendants manufacturers and/or suppliers, they were unreasonably dangerous, and were more dangerous than an ordinary consumer would expect.

130.   At all times herein mentioned, Ranitidine products, including Zantac, were in defective conditions and unsafe, and Defendants knew or had reason to know that said products were defective and unsafe, especially when used in the form and manner as provided by the Defendants.

131.   Defendants knew or should have known that at all times herein mentioned its Ranitidine products, including Zantac, were in defective conditions and were and are inherently dangerous and unsafe.

132.   At the time of the Plaintiff's uses of Zantac, the Zantac were being used for the purposes and in a manner normally intended for the treatment of peptic disorders, including erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

133.   Defendants with this knowledge voluntarily designed Ranitidine products, including Zantac, in a dangerous condition for use by the public, and in particular the Plaintiff. Defendants had a duty to create products that were not unreasonably dangerous for its normal, intended use.

134.   Defendants created products unreasonably dangerous for their normal, intended use.

135.   The Ranitidine products, including Zantac, designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were manufactured defectively in that Ranitidine products, including Zantac, left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

136.     The Ranitidine products, including Zantac, designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Ranitidine products, including Zantac, was manufactured.

137.     Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

138.     Plaintiff could not, by the exercise of reasonable care, have discovered Zantac's defects herein mentioned and perceived its danger.

139.     The Ranitidine products, including Zantac, designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate warnings or instructions as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including cancer as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

140.     Ranitidine products, including Zantac, were designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

141.     Ranitidine products, including Zantac, designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including cancer as well as other severe and

30

permanent health consequences from Ranitidine products, including Zantac product use. Defendants failed to provide adequate warnings to users or consumers of their products, and continued to improperly advertise, market and/or promote their Ranitidine products, including Zantac.

142.    By reason of the foregoing, the Defendants have become strictly liable in tort to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of defective products-the Rantidine products, including.

143.    Defendants' defective design, manufacturing defect, and inadequate warnings of Ranitidine products, including Zantac, were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

144.    That said defects in Defendants' drug Ranitidine products, including Zantac, were a substantial factor in causing Plaintiff injuries.

145.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including cancer as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

146.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

147.    By reason of the foregoing, Plaintiff has been damaged as against the Defendants in an amount in excess of $75,000 to be proven at trial.

### THIRD CAUSE OF ACTION
### AS AGAINST ALL DEFENDANTS
### (BREACH OF EXPRESS WARRANTY)

148.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully stated herein.

149.     Defendants expressly warranted that Ranitidine products, including Zantac, were safe and well accepted by users.

150.     Ranitidine products, including Zantac, do not conform to these express representations because Ranitidine products, including Zantac, are not safe and have numerous serious side effects, many of which were not accurately warned about by Defendants. As a direct and proximate result of the breach of said warranties, Plaintiff suffered and/or will continue to suffer severe and permanent personal injuries, harm and economic loss.

151.     Plaintiff did rely on the express warranties of the Defendants herein.

152.     Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Ranitidine products, including Zantac, in recommending, prescribing, and/or dispensing Ranitidine products, including Zantac.

153.     The Defendants herein breached the aforesaid express warranties, as their drug Ranitidine products, including Zantac, were defective.

154.     Defendants expressly represented to Plaintiff's physicians, healthcare providers, and/or the FDA that Ranitidine products, including Zantac, were safe and fit for use for the purposes intended, that they were of merchantable quality, that they did not produce any dangerous side effects in excess of those risks associated with other forms for treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome,

that the side effects it did produce were accurately reflected in the warnings and that it was

adequately tested and fit for its intended use.

155.    Defendants knew or should have known that, in fact, said representations and

warranties were false, misleading and untrue in that Ranitidine products, including Zantac,

were not safe and fit for the use intended, and, in fact, produced serious injuries to the users

that were not accurately identified and represented by Defendants.

156.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer

serious and dangerous side effects including cancer as well as other severe and personal injuries

which are permanent and lasting in nature, physical pain and mental anguish, including diminished

enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or

medications.

157.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will

require more health care and services and did incur medical, health, incidental and related

expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be

required to obtain further medical and/or hospital care, attention, and services.

158.    By reason of the foregoing, Plaintiff has been damaged as against the

Defendants in an amount in excess of $75,000 to be proven at trial.

**FOURTH CAUSE OF ACTION**
**AS AGAINST ALL DEFENDANTS**
**(BREACH OF IMPLIED WARRANTIES)**

159.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint

as though fully stated herein.

160.    At all times herein mentioned, the Defendants manufactured, compounded,

portrayed, distributed, recommended, merchandized, advertised, promoted and sold Ranitidine

products, including Zantac, and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Ranitidine products, including Zantac, for the treatment of peptic disorders which include erosive esophagitis, GERI), and Zollinger-Ellison syndrome.

161.    At the time Defendants marketed, sold, and distributed Ranitidine products, including Zantac, for use by Plaintiff, Defendants knew of the uses for which Ranitidine products, including Zantac, was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

162.    The Defendants impliedly represented and warranted to the users of Ranitidine products, including Zantac, and their physicians, healthcare providers, and/or the FDA that Ranitidine products, including Zantac, were safe and of merchantable quality and fit for the ordinary purpose for which said products were to be used.

163.    That said representations and warranties aforementioned were false, misleading, and inaccurate in that Ranitidine products, including Zantac, were unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

164.    Plaintiff, and/or members of the medical community and/or healthcare professionals did rely on said implied warranty of merchantability of fitness for a particular use and purpose.

165.    Plaintiff's and Plaintiff's physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Ranitidine products, including Zantac, were of merchantable quality and safe and fit for their intended use.

166.    Ranitidine products, including Zantac, were injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the

products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

167.    The Defendants herein breached the aforesaid implied warranties, as their Ranitidine products, including Zantac, were not fit for its intended purposes and uses.

168.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including cancer as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

169.    As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

170.    By reason of the foregoing, Plaintiff has been damaged as against the Defendants in an amount in excess of $75,000 to be proven at trial.

## FIFTH CAUSE OF ACTION
## AS AGAINST ALL DEFENDANTS
## (FRAUDULENT MISREPRESENTATION)

171.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully stated herein.

172.    The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Plaintiff, and/or the FDA, and the public in general, that said products, Ranitidine products, including Zantac, had been tested and were found to be safe

35

and/or effective for treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

173.     That representations made by the Defendants were, in fact, false.

174.     When said representations were made by the Defendants, they knew those representations to be false and it willfully, wantonly and recklessly disregarded whether the representations were true.

175.     These representations were made by the Defendants with the intent of defrauding and deceiving Plaintiff, Plaintiff's physician, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Zantac, for treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiff herein.

176.     At the time the aforesaid representations were made by the Defendants and, at the time Plaintiff used Zantac, Plaintiff was unaware of the falsity of said representations and reasonably believed them to be true.

177.     In reliance upon said representations, the Plaintiff was induced to and did use Ranitidine products, including Zantac, thereby sustaining severe and permanent personal injuries, and/or being at an increased risk of sustaining severe and permanent personal injuries in the future.

178.     The Defendants knew and were aware or should have been aware that Ranitidine products, including Zantac, had not been sufficiently tested, were defective in nature, and/or that they lacked adequate and/or sufficient warnings.

36

179.     The Defendants knew or should have known that Ranitidine products, including Zantac, had a potential to, could, and would cause severe and grievous injury to the users of said products, and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

180.     The Defendants brought Ranitidine products, including Zantac, to the market, and acted fraudulently, wantonly and maliciously to the detriment of Plaintiff.

181.     As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including cancer as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

182.     As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

183.     By reason of the foregoing, Plaintiff has been damaged as against the Defendants in an amount in excess of $75,000 to be proven at trial.

**SIXTH CAUSE OF ACTION**
**AS AGAINST ALL DEFENDANTS**
**(FRAUDULENT CONCEALMENT)**

184.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully stated herein.

185.     At all times during the course of dealing between Defendants and Plaintiff, and/or Plaintiff's healthcare providers, and/or the FDA, the Defendants misrepresented the safety of Ranitidine products, including Zantac, for their intended use.

186.     The Defendants knew or were reckless in not knowing that their representations were false.

187.     In representations to Plaintiff, and/or Plaintiff's healthcare providers, and/or the FDA, the Defendants fraudulently concealed and intentionally omitted the following material information:

(a)   that Ranitidine products, including Zantac, were not as safe as other forms of treatment for treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome;

(b)   that the risks of adverse events with Ranitidine products, including Zantac, were higher than those with other forms of treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome;

(c)   that the risks of adverse events with Ranitidine products, including Zantac, were not adequately tested and/or known by the Defendants;

(d)   that the Defendants were aware of dangers in Ranitidine products, including Zantac, in addition to and above and beyond those associated with other forms of treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome;

(e)   that Ranitidine products, including Zantac, were defective, and that they caused dangerous side effects, including but not limited to stomach cancer and renal injuries including but not limited to renal insufficiency and/or renal failure;

(f)   that patients needed to be monitored more regularly than normal while using Ranitidine products, including Zantac;

(g)   that Ranitidine products, including Zantac, were manufactured negligently;

(h)   that Ranitidine products, including Zantac, were manufactured defectively;

(i)   that Ranitidine products, including Zantac, were manufactured improperly;

(j)   that Ranitidine products, including Zantac, were designed negligently;

(k)   that Ranitidine products, including Zantac, were designed defectively; and

(l)   that Ranitidine products, including Zantac, were designed improperly.

188.    The Defendants were under a duty to disclose to Plaintiff, and Plaintiff's physicians, hospitals, healthcare providers, and/or the FDA the defective nature of Zantac, including but not limited to the heightened risks of stomach cancer and renal injuries.

189.    The Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who use Ranitidine products, including Zantac, including Plaintiff, in particular.

190.    The Defendants' concealment and omissions of material facts concerning, inter alia, the safety of Ranitidine products, including Zantac, were made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiff, and Plaintiff's physicians, hospitals and healthcare providers into reliance, continued use of Zantac, and actions thereon, and to cause them to purchase, prescribe, and/or dispense Ranitidine products, including Zantac, and/or use the products.

191.    The Defendants knew that Plaintiff, and Plaintiff's physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind the Defendants' concealment and omissions, and that these included material omissions of facts surrounding Ranitidine products, including Zantac, as set forth herein.

192.    Plaintiff, as well as Plaintiff's doctors, healthcare providers, and/or hospitals reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by the Defendants.

39

193.      As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including cancer as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

194.      As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

195.      By reason of the foregoing, Plaintiff's has been damaged as against the Defendants in an amount in excess of $75,000 to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**AS AGAINST ALL DEFENDANTS**
**(NEGLIGENT MISREPRESENTATION)**

196.      Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully stated herein.

197.      The Defendants had a duty to represent to the medical and healthcare community, and to the Plaintiff, the FDA and the public in general that said products, Zantac, had been tested and found to be safe and effective for treatment of peptic disorders including erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

198.      The representations made by the Defendants were, in fact, false.

199.      The Defendants failed to exercise ordinary care in the representation of Ranitidine products, including Zantac, while involved in their manufacture, sale, testing, quality assurance, quality control, and/or distribution of said product into interstate commerce, in that

40

Defendants negligently misrepresented Zantac's high risks of unreasonable, dangerous side effects.

200.     The Defendants breached their duty in representing Zantac's serious side effects to the medical and healthcare community, to Plaintiff, the FDA and the public in general.

201.     As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including cancer as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

202.     As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

203.     By reason of the foregoing, Plaintiff has been damaged as against the Defendants in an amount in excess of $75,000 to be proven at trial.

### EIGHT CAUSE OF ACTION
### AS AGAINST ALL DEFENDANTS
### (FRAUD AND DECEIT)

204.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully stated herein.

205.     The Defendants conducted research and used Ranitidine products, including Zantac, as part of their research.

206.     As a result of the Defendants' research and testing, or lack thereof, the Defendants blatantly and intentionally distributed false information, including but not limited to

assuring the public, the Plaintiff, Plaintiff's doctors, hospitals, healthcare professionals, and/or the FDA that Ranitidine products, including Zantac, were safe and effective for treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

207.     As a result of the Defendants' research and testing, or lack thereof, the Defendants intentionally omitted certain results of testing and research to the public, healthcare professionals, and/or the FDA, including Plaintiff.

208.      The Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public and Plaintiff, as well as Plaintiff's respective healthcare providers and/or the FDA.

209.     The information distributed to the public, the FDA, and Plaintiff by the Defendants, including but not limited to reports, press releases, advertising campaigns, television commercials, print ads, magazine ads, billboards, and all other commercial media contained material representations of fact and/or omissions.

210.     The information distributed to the public, the FDA, and Plaintiff by the Defendants intentionally included representations that the Defendants' Ranitidine products, including Zantac were safe and effective for use for treatment of peptic disorders, which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

211.     The information distributed to the public, the FDA, and Plaintiff, by the Defendants intentionally included representations that the Defendants' drugs Zantac, carried the same risks, hazards, and/or dangers as other forms of treatment for treatment of peptic disorders, which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

212.     The information distributed to the public, the FDA, and the Plaintiff by the Defendants intentionally included false representations that Ranitidine products, including Zantac, were not injurious to the health and/or safety of its intended users.

213.     The information distributed to the public, the FDA, and Plaintiff, by the Defendants intentionally included false representations that Ranitidine products, including Zantac, were as potentially injurious to the health and/or safety of its intended as other forms of treatment for treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

214.     These representations were all false and misleading.

215.     Upon information and belief, the Defendants intentionally suppressed, ignored and disregarded test results not favorable to the Defendants, and results that demonstrated that Ranitidine products, including Zantac, were not safe as a means of treatment for treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

216.     The Defendants intentionally made material representations to the FDA and the public, including the medical profession, and the Plaintiff, regarding the safety of Ranitidine products, including Zantac, specifically but not limited to Zantac, not having dangerous and serious health and/or safety concerns.

217.     The Defendants intentionally made material representations to the FDA and the public in general, including the medical profession, and the Plaintiff, regarding the safety of Ranitidine products, including Zantac, being safe means for treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

218.     That it was the purpose of the Defendants in making these representations to deceive and defraud the public, the FDA, and/or the Plaintiff, to gain the confidence of the public, healthcare professionals, the FDA, and/or the Plaintiff, to falsely ensure the quality and fitness for use of Ranitidine products, including Zantac, induce the public, and/or the Plaintiff to purchase, request, dispense, prescribe, recommend, and/or continue to use Zantac.

219.     The Defendants made the aforementioned false claims and false representations with the intent of convincing the public, healthcare professionals, the FDA, and/or the Plaintiff that Ranitidine products, including Zantac, were fit and safe for use for treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

220.     The Defendants made the aforementioned false claims and false representations with the intent of convincing the public, healthcare professionals, the FDA, and/or the Plaintiff that Ranitidine products, including Zantac, were fit and safe for use for treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

221.     The Defendants made claims and representations in its documents submitted to the FDA, to the public, to healthcare professionals, and Plaintiff that Ranitidine products, including Zantac, did not present serious health and/or safety risks.

222.     The Defendants made claims and representations in its documents submitted to the FDA, to the public, to healthcare professionals, and the Plaintiff that Ranitidine products, including Zantac, did not present health and/or safety risks greater than other oral forms for treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

223.     These representations and others made by the Defendants were false when made, and/or were made with a pretense of actual knowledge when knowledge did not actually exist, and/or were made recklessly and without regard to the actual facts.

224.     These representations and others, made by the Defendants, were made with the intention of deceiving and defrauding the Plaintiff, including Plaintiff's respective healthcare professionals and/or the FDA, and were made in order to induce the Plaintiff and/or Plaintiff's respective healthcare professionals to rely upon misrepresentations and caused the Plaintiff to purchase, use, rely on, request, dispense, recommend, and/or prescribe Ranitidine products, including Zantac.

225.     The Defendants, recklessly and intentionally falsely represented the dangerous and serious health and/or safety concerns of Ranitidine products, including Zantac, to the public at large, the Plaintiff in particular, for the purpose of influencing the marketing of a product known to be dangerous and defective and/or not as safe as other alternatives, including other forms of treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

226.     The Defendants willfully and intentionally failed to disclose the material facts regarding the dangerous and serious safety concerns of Ranitidine products, including Zantac, by concealing and suppressing material facts regarding the dangerous and serious health and/or safety concerns of Ranitidine products, including Zantac.

227.     The Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts and made false representations with the purpose and design of deceiving and lulling the Plaintiff, as well as Plaintiff's respective healthcare professionals into a sense of security so that Plaintiff would rely on the representations and purchase, use and rely

on Ranitidine products, including Zantac, and/or that Plaintiff's respective healthcare providers would dispense, prescribe, and/or recommend the same.

228.     The Defendants, through their public relations efforts, which included but were not limited to the public statements and press releases, knew or should have known that the public, including the Plaintiff, as well as Plaintiff's respective healthcare professionals would rely upon the information being disseminated.

229.     The Defendants utilized direct to consumer adverting to market, promote, and/or advertise Ranitidine products, including Zantac.

230.     The Plaintiff and/or Plaintiff's respective healthcare professionals did in fact rely on and believe the Defendants' representations to be true at the time they were made and relied upon the representations as well as the superior knowledge of treatment of peptic disorders which include erosive esophagitis, GERD, and Zollinger-Ellison syndrome.

231.     At the time the representations were made, the Plaintiff and/or Plaintiff's respective healthcare providers did not know the truth with regard to the dangerous and serious health and/or safety concerns of Ranitidine products, including Zantac.

232.     The Plaintiff did not discover the true facts with respect to the dangerous and serious health and/or safety concerns, and the false representations of the Defendants, nor could the Plaintiff with reasonable diligence have discovered the true facts.

233.     Had the Plaintiff known the true facts with respect to the dangerous and serious health and/or safety concerns of Ranitidine products, including Zantac, Plaintiff would not have purchased, used and/or relied on the Defendants' drug ranitidine products, including Zantac.

234.     The Defendants' aforementioned conduct constitutes fraud and deceit, and was committed and/or perpetrated willfully, wantonly and/or purposefully on the Plaintiff.

235.     As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including cancer as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

236.     As a result of the foregoing acts and omissions the Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental and related expenses. Plaintiff is informed and believes and further alleges that Plaintiff will in the future be required to obtain further medical and/or hospital care, attention, and services.

237.     By reason of the foregoing, Plaintiff has been damaged as against the Defendants in an amount in excess of $75,000 to be proven at trial.

### NINTH CAUSE OF ACTION
### PUNITIVE DAMAGES

238.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully stated herein.

239.     Defendants' conduct as alleged in the Complaint shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights, so as to warrant the imposition of punitive damages.

240.     As a direct and proximate result of Defendants' malicious, fraudulent, and/or intentional disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages to punish Defendants and deter similar wrongdoing by others in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants as follows:

A.      For economic and non-economic damages, special damages, and general damages including pain and suffering, in an amount to be supported by the evidence at trial;

B.      For actual and compensatory damages for the acts complained of herein in an amount to be determined by the jury and as provided by applicable law;

C.      For exemplary and punitive damages sufficient to punish Defendants for the acts complained of herein and to deter Defendants and others from future wrongful practices, in an amount to be determined by the jury;

D.      For disgorgement of profits for the acts complained of herein in an amount to be determined by the jury;

E.      For an award of reasonable attorneys' fees, court costs, and other litigation expenses;

F.      For prejudgment and post-judgment interest;

G.      For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated: April 23, 2020                    Respectfully submitted,

      /s/Debora A. O'Neill

Jack Meyerson
Debora A. O'Neill
MEYERSON & O'NEILL
1600 Market Street, Suite 1305
Philadelphia, PA 19103
Telephone: 215-972-1276
Fax: 215-972-0277
jmeyerson@meyersonlawfirm.com
doneill@meyersonlawfirm.com

Attorneys for Plaintiff